UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Tambria E. Corbett,
     Plaintiff

     v.                                    Case No. 25-cv-111-SM-AJ
                                           Opinion No. 2026 DNH 009

Frank Bisignano, Commissioner,
Social Security Administration,
     Defendant


**O R D E R**

The Social Security Administration concluded that plaintiff, Tambria Corbett, improperly accepted Title II disability benefit payments for more than two years after she returned to work and earned income in excess of the "substantial gainful activity" threshold. In total, the SSA determined that Corbett had accepted over $52,000 in Disability Insurance Benefits to which it claims she was not entitled. In response, Corbett sought a waiver for those overpayments, saying she was "without fault" in causing them. That request was administratively denied, both initially and on reconsideration. She then requested a hearing before an Administrative Law Judge, who concluded that Corbett was "at fault" for the overpayments and, therefore, not entitled to a waiver of overpayment recovery.

Corbett appealed that decision to the Appeals Council, which denied her request for review, making the ALJ's determination the final decision of the Commissioner.  Pursuant to 42 U.S.C. § 405(g), Corbett now moves to reverse or vacate the Commissioner's decision finding that she was at fault for the overpayment of benefits and, therefore, obligated to repay them.  The government objects.

Determining whether Corbett was "without fault" in causing the overpayment of benefits turns on whether she reasonably could have been expected to understand that, when she returned to work in December of 2018, she was not entitled to a "Trial Work Period" because she had already used her only Trial Work Period more nearly 25 years earlier, during an unsuccessful effort to re-enter the workforce in the early 1990's.  Because the ALJ neither addressed nor determined the reasonableness of Corbett's asserted misunderstanding (or whether that misunderstanding was caused, in whole or in part, by misinformation she received from an SSA official), this matter must necessarily be remanded for further consideration.

**Legal Background**

A.    Standard of Review.

Under the provisions of 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Factual findings and credibility determinations made by the Commissioner are conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g). See also Irlanda Ortiz v. Secretary of Health & Human Services, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Importantly, then, it is something less than a preponderance of the evidence. So, the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. See Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620 (1966). See also Richardson v. Perales, 402 U.S. 389, 401 (1971).


B.    Disability Payments and Trial Work Periods.

An individual is disabled and entitled to Disability Insurance Benefits if he or she is unable "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial Gainful Activity" means work activity that involves performing "significant and productive physical or mental duties" and the activity is one that is typically "done (or intended) for pay or profit." 20 C.F.R. § 404.1510. See also 20 C.F.R. § 404.1572. A person will be deemed to have engaged in substantial gainful activity if their monthly income exceeds an established threshold. See 20 C.F.R. § 404.1574(b). See also Social Security Programs Operations Manual System ("POMS"), Tables of SGA Earnings Guidelines and Effective Dates Based on Year of Work Activity, DI 10501.015.

But, to encourage individuals who are receiving disability payments to return to work, the pertinent regulations permit such individuals to engage in a Trial Work Period ("TWP") See generally 20 C.F.R. § 404.1592. During the Trial Work Period, a beneficiary receives both their full disability benefits and any earned income - that is, the beneficiary is able to test her ability to return to work, without losing social security benefits or her "disabled" status. 20 C.F.R. § 404.1592(a).

4

The Trial Work Period ends when the beneficiary has earned
income above a set limit in nine separate "service months"
(which need not be continuous) over a five-year period.  20
C.F.R. § 404.1592.  See also POMS, The Trial Work Period, DI
13010.035, § D(2)(a).  The monthly income limits that define
service months (which are significantly lower than those that
define "substantial gainful activity") are set out in 20 C.F.R.
§ 404.1592.  So, if a beneficiary earns above a certain amount
in a particular month during a Trial Work Period, that month
counts as one of the nine available "service months."

    After the Trial Work Period ends, a beneficiary enters a
three-year extended period of eligibility ("EPE").  The EPE is a
re-entitlement period under Title II for a beneficiary who has
completed nine months of trial work but continues to have a
disabling impairment.  POMS, Extended Period of Eligibility, DI
13010.210, §§ A & B.  During the three-year EPE, beneficiaries
remain eligible for benefit payments so long as they continue to
meet the definition of disability and their monthly earnings
remain below the "substantial gainful activity" level.  Id.  In
other words, during the EPE, a beneficiary may earn some income
without losing entitlement to disability benefits.  But, the
beneficiary will not receive disability benefits for any month

in which earnings exceed the SGA limit.  After three years,
however, those rules change and if a beneficiary should earn
monthly income in excess of the SGA limit, not only will he or
she not receive disability benefits that month, but the
beneficiary will also immediately be deemed no longer disabled
within the meaning of the statute and regulations.  See
generally POMS, Extended Period of Eligibility, DI 13010.210.
In short, "The first 36 months after the [Trial Work Period] is
the re-entitlement period. . . . The EPE may last indefinitely
beyond the re-entitlement period if a beneficiary with a
disabling impairment never engages in SGA.  In such case, the
EPE continues until the beneficiary either engages in SGA or we
find that the beneficiary is no longer disabled." Id, § G,
"When the EPE Begins and Ends."

    Beneficiaries of Title II disability insurance payments are
entitled to one Trial Work Period (and the ensuing Extended
Period of Eligibility) during a period of benefits entitlement.
20 C.F.R. § 404.1592(c).  See also POMS, The Trial Work Period,
DI 13010.035, § H.  To be eligible for a second Trial Work
Period, a person's benefits must be terminated and then
reinstated after a second finding of disability - that is, the
claimant must be deemed eligible for a new period of disability

benefits, either through a new application for benefits or
through an "Expedited Reinstatement" of benefits ("EXR").

     Because an Expedited Reinstatement of Benefits is
tangentially related to Corbett's claim, it is probably worth
noting the following.  A beneficiary whose benefits have been
terminated "may become eligible for an expedited reinstatement
of benefits ("EXR") if, within 60 months of termination, their
medical condition prevents them from performing substantial
gainful activity.  EXR establishes a new period of disability
with a new month of entitlement."  POMS, Expedited Reinstatement
Overview, DI 13050.001, § A (emphasis supplied).  Because an
Expedited Reinstatement of Benefits is based upon a new period
of disability, it allows the beneficiary to engage in second
Trial Work Period.  Id. at § B(2).

     As discussed more fully below, in this case Corbett's
disability payments stopped for approximately 19 months in the
early 1990's (during the Extended Period of Eligibility
associated with her first attempt to re-enter the workforce) and
then resumed when she stopped working.  Based upon that
cessation and subsequent restoration of benefits, Corbett says
she reasonably believed that her benefits had been "terminated"
and then "reinstated" in 1994.  Consequently, says Corbett, she

believed she was allowed a second trial work period when she attempted to re-enter the workforce roughly 24 years later and, therefore, was permitted to earn some income without putting her disability benefits in jeopardy.

C.    Recovery (and Waiver) of Benefit Overpayments.

When the SSA makes an overpayment of benefits to a person, the Act requires the Commissioner to seek repayment.  42 U.S.C. § 404(a).  However, recovery of the overpayment is waived when the beneficiary is (1) "without fault" for the overpayment and (2) the recovery of such amount from the beneficiary "would defeat the purpose of [Subchapter II of the Act] or would be against equity and good conscience."  42 U.S.C. § 404(b)(1). When determining whether a person is without fault, the SSA considers "all pertinent circumstances" of the individual, including their age, intelligence, mental limitations, and educational background.  20 C.F.R. § 404.507.  A claimant will be found to have been "at fault" for the overpayment if it resulted from:

>    (a)    An incorrect statement made by the individual which he knew or should have known to be incorrect; or
>
>    (b)    Failure to furnish information which he knew or should have known to be material; or

      (c)   With respect to the overpaid individual only, <u>acceptance of a payment which he either knew or could have been expected to know was incorrect</u>.

<u>Id</u>. (emphasis supplied).  The highlighted provision - knowing acceptance of an incorrect payment - is the one upon which the ALJ seems to have relied in this case.


      One basis for a waiver of the obligation to repay an overpayment exists when a beneficiary relied on "erroneous information from an official source within the Social Security Administration . . . with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto."  20 C.F.R. § 404.510a.  Under such circumstances, the beneficiary shall be deemed to be "without fault" for the overpayment of benefits.  <u>Id</u>.  <u>See also</u> POMS, <u>Misinformation from an Official Source - Waiver</u>, GN 02250.061, § B(2).


      While the government bears the burden of establishing that a claimant has been overpaid, the claimant bears the burden of showing that she was "without fault" for the overpayment and otherwise entitled to a waiver.  <u>See, e.g.</u>, <u>Nadeua v. Barnhart</u>, 2006 DNH 006, 2006 WL 156999 at *5 (D.N.H. Jan. 19. 2006).  <u>But see</u> 20 C.F.R. § 404.506(b)(2) ("Notwithstanding any other

provision of this subpart, <u>we will presume</u> that an individual
who requests waiver of a <u>qualifying</u> overpayment <u>is without fault</u>
in causing the overpayment (see § 404.507) <u>unless we determine</u>
that the qualifying overpayment made to a beneficiary or a
representative payee was the result of fraud or similar fault.")
(emphasis supplied).[1]


### Claimant's History

Corbett began receiving Disability Insurance Benefits more
than 30 years ago, in March of 1991, after being found disabled
by reason of fibrous dysplasia of the skull - a non-cancerous,
abnormal growth of fibrous tissue in place of normal bone.  Nine
months later, in December of 1991, she returned to work and
began a Trial Work Period.  From December of 1991, through
December of 1992, Corbett earned nearly $2,700 per month -
substantially in excess of the TWP earnings limit of $200 per
month.  Nevertheless, she continued to receive her full

---

[1]   A "qualifying overpayment" is one "that accrued during the
pandemic period (see § 404.501(a) [defining that period as
"beginning on March 1, 2020, and ending on September 30, 2020"]
because of the actions that we took in response to the COVID-19
national public health emergency, including the suspension of
certain of our manual workloads that would have processed
actions identifying and stopping certain overpayments."  20
C.F.R. § 404.506(b)(1).  Here, some of the claimed overpayments
to Corbett fell within that "pandemic" period, but neither the
parties nor the ALJ addressed any potential application of §
404.506(b)(2) to this case.

disability payments throughout the nine-month Trial Work Period
(which ended in August of 1992) and the three-month grace period
that followed (which ended in November of 1992).

In late 1992, Corbett then began a three-year Extended
Period of Eligibility while she continued to work.  During that
period, she earned approximately $2,400 per month through
December of 1993, followed by about $1,500 per month until June
of 1994.  Corbett's income during each of those months was
substantially higher than the SGA monthly threshold at the time.
Consequently, she did not receive any disability benefit
payments during that period (that is the period to which she
points as having involved the "termination" of her benefits).

In July of 1994, Corbett stopped working, her benefit
payments resumed, and the SSA continued to acknowledge that she
was "disabled," as the term is used in the Act.  All agree that
up to that point, and for the next two decades, Corbett properly
received Title II disability benefits, in the correct amount,
each month.

In December of 2018, more than twenty-four years after her
first effort to return to work, Corbett again attempted to re-
enter the workforce.  The following month - in January of 2019 -

11

she began earning income in excess of the SGA monthly limit.
Because she had already used her only Trial Work Period (at
least as the SSA sees things), those earnings of roughly $1,500
per month triggered an automatic finding that she was no longer
disabled and, therefore, no longer entitled to benefit payments.
But, because it appears that Corbett was not communicating with
the SSA, benefit payments continued and the SSA did not discover
the error for nearly three years.  In September of 2021, the SSA
identified the overpayments and determined that Corbett
improperly received and retained benefits during the 30-month
period between April of 2019 through September of 2021.  It
calculated that the total overpayment of disability benefits to
Corbett was $52,031.20.

But, says Corbett, before returning to work in December of
2018, she contacted the SSA and asked about another nine-month
return to work as a "Trial Work Period."  And, according to
Corbett, the SSA representative with whom she spoke told her she
could do that, effectively allowing/authorizing the second Trial
Work Period.

> I did call and asked if I could do a nine-month trial
> work period and they just told me I could, so I did do
> that knowing that it would only be for nine months.
> So I did that and then I cut my hours back down after
> the nine months and I thought everything was fine,

> till I got a letter.  Just thought everything was
> okay.

Admin. Rec. at 27-28.  In response, the government says it has been unable to find any record of Corbett having spoken to anyone at the SSA about returning to work in December of 2018, obtaining permission to do so, or securing a second Trial Work Period.  Moreover, it points out that Corbett acknowledges that she never received written confirmation from the SSA that she could return to work as part of a second Trial Work Period. Admin. Rec. at 28-29.  That lack of written documentation is, perhaps, relevant depending on how scrupulous the SSA is in keeping such records and how thorough it was in searching for them, but it is certainly not dispositive.  For obvious reasons related to the complexity of the regulations and the capacity of lay people to understand them, beneficiaries are entitled to rely upon both written and oral advice (even if incorrect) that they receive from official sources at the SSA.  See POMS, Misinformation from an Official Source - Waiver, GN 02250.061, § B(1) ("An individual is misinformed when they receive information from an official source that subsequently proved to be incorrect.  Misinformation can be given both orally and in writing.").

On November 2, 2021, shortly after receiving a notice from
the SSA informing her of the overpayment of benefits and
notifying her of her obligation to repay roughly $52,000,
Corbett applied for an Expedited Reinstatement of Benefits.
That application was denied on January 26, 2022, because the
Social Security Administration found that the Corbett's health
had improved and she was able to work (as borne out by her
recent earnings record).  That denial of the reinstatement of
Corbett's benefits is not presently at issue.

On November 14, 2021, Corbett requested a waiver of the
overpayment.  Admin. Rec. at 181-94.  That request was
administratively denied, both initially and on review.  She then
requested a hearing before an Administrative Law Judge, who
conducted a de novo hearing to resolve a single issue: whether
Corbett was "without fault" for the overpayments and otherwise
entitled to a waiver of the obligation to reimburse the
government for those overpayments.

### The ALJ's Findings

After taking testimony from Corbett and reviewing the
record, the ALJ concluded that Corbett had, indeed, received
benefit overpayments from April of 2019 through September of
2021.  Admin. Rec. at 14.  Next, he rejected Corbett's claim

14

that she was entitled to a new Trial Work Period when she
returned to work in December of 2018.  Id. at 14-15.  Finally,
the ALJ concluded that, "Given the claimant's past history
involving a trial work period and working over substantial
gainful activity amounts [more than 24 years earlier], she knew
or should have known that her return to work in 2019 could
affect her entitlement to disability benefits."  Id. at 15
(emphasis supplied).  Based upon those findings and conclusions,
the ALJ held that Corbett was "at fault in causing the
overpayment," id. at 14, and, therefore, not entitled to a
waiver of recovery of the overpaid disability benefits.

Parenthetically, the court notes that the ALJ's ultimate
conclusion (highlighted above) - that Corbett "knew or should
have known that her return to work in 2019 could affect her
entitlement to disability benefits" - deviates from the "fault"
language in section 404.507(c) and imposes a less demanding
legal standard than the applicable regulation.  The question is
not whether Corbett knew or should have known that a return to
work "could affect" her disability payments - she plainly did.
Rather, § 404.507(c) demands an assessment of whether Corbett
knew or should have known that she had improperly retained an
incorrect benefit payment.  That question remains unresolved in
this record.

15

**Discussion**

Corbett acknowledges that she used a Trial Work Period in August of 1992. Then, while she was working and within the ensuing Extended Period of Eligibility, her disability benefits stopped. But, in July of 1994, when she was unable to continue working, her disability benefits payments were restored. That cessation and subsequent resumption of disability benefits payments more than 30 years ago, says Corbett, constituted a "new period of eligibility" – or, at a minimum, she says it was not unreasonable for her to hold that belief. And, says Corbett, that "new period of eligibility" entitled her to a new or second Trial Work Period. More specifically, Corbett says it was not unreasonable for her to believe that when her benefits were stopped for 19 months in December of 1992, but then restored in July of 1994, that was pursuant to the SSA's decision to "reinstate" benefits that had been "terminated," rather than simply a "resumption" of her prior benefits under the provisions governing Extended Period of Eligibility. As Corbett's counsel explained,

> In finding the Plaintiff at fault for the alleged
> overpayment, the ALJ found that the Plaintiff should
> have been aware of the difference between whether her
> benefits were resumed in July of 1994 under an
> Extended Period of Eligibility ("EPE") or an Expedited
> Reinstatement ("EXR"). One would have entitled the

16

> Plaintiff to a new trial work period and the other
> would not, and this is something that the ALJ presumed
> she should have been aware of when she attempted a
> second return to work attempt over twenty-four years
> later.
>
> In making this determination, the ALJ placed an
> expectation of familiarity with SSA administrative
> rules arcana on the Plaintiff that is beyond that of
> many regularly practicing attorneys in this area of
> law.

Claimant's Legal Memorandum (document no. 7-1) at 3-4.[2]


That nuanced (at least to a lay person) distinction between benefits that were merely "resumed" under a previous finding of disability and those that were "reinstated" following their "termination" is critical because if Corbett's benefits had been "reinstated" in the latter manner, she would have been entitled to a second Trial Work Period.  Determining the difference between those two scenarios is, undoubtedly, confusing and complicated.


Indeed, the Social Security Administration's own "Program Operations Manual Systems" adds to the confusion in this area by stating that the Extended Period of Eligibility "permits re-

---

[2]    As noted above, a beneficiary whose benefits have been "terminated," but subsequently "reinstated" under an EXR is entitled to a new or second Trial Work Period. See POMS, Expedited Reinstatement Overview, DI 13050.001.

instatement of benefits when the beneficiary's benefits have
ceased due to SGA and their earnings falls below the SGA
levels."  POMS, Extended Period of Eligibility (EPE), DI
13010.210 (emphasis supplied).  That imprecise and confusing
language - particularly the use of the word "reinstate" in the
context of an Extended Period of Eligibility - is exactly what
gives rise to Corbett's asserted misunderstanding.[3]

Corbett has plausibly alleged that she reasonably and
honestly believed that 30 years ago, when her benefits were
stopped for 19 months during an Extended Period of Eligibility
while she tried to re-enter the workforce (December, 1992,
through June, 1994), that constituted a "cessation" or
"termination" of her benefits, which were then "reinstated" when
she stopped working.  That, she claims to have reasonably
believed, entitled her to a second Trial Work Period which was
then confirmed by an SSA agent when Corbett telephoned a local
SSA office for guidance.  See, e.g., POMS, Expedited
Reinstatement Overview, DI 13050.001, § B(2) (noting that "a

---

[3]    Compare POMS, Extended Period of Eligibility (EPE), DI
13010.210 ("The EPE permits reinstatement of benefits when the
beneficiary's benefits have ceased due to SGA, and their
earnings fall below the SGA levels.") with POMS, Expedited
Reinstatement Overview, DI 13050.001, §§ B(2) & C ("Claimants
previously entitled to disability insurance benefits (DIB) whose
monthly benefits terminated due to their own SGA" are eligible
for "reinstatement" of benefits under an EXR.).

beneficiary or recipient reinstated under an EXR . . . gets a
new trial work period (TWP) and an extended period of
eligibility (EPE).").

     For a typical beneficiary, not exceedingly well-versed in
the SSA's regulations and POMS, it might well be reasonable for
them to misunderstand the legal distinction between benefits
that have merely "ceased" during an Extended Period of
Eligibility but subsequently "reinstated," (no eligibility for a
new Trial Work Period), and those that were "terminated" but
later "reinstated" under, say, an EXR (with full eligibility for
a second Trial Work period).  Id.  Moreover, says claimant, her
belief that she was entitled to a second trial work period was
reinforced when, according to her testimony, she contacted the
SSA and was told that she could, indeed, return to work under a
new Trial Work Period.  See Admin. Rec. at 27-28.

     The ALJ plainly understood the nature of Corbett's
argument:

     **ALJ:** So your assertion is that when the benefits were
     reinstated [in 1994] that's a new entitlement period,
     and therefore she would have been entitled to a new
     trial work period later on?

     **ATTY:**  Correct.

Transcript of Hearing, Admin. Rec. at 26.  The ALJ concluded,
however, that Corbett was not entitled to a second Trial Work
Period and, therefore was properly deemed to be no longer
disabled when, upon her return to work in December of 2018, she
soon began earning more than the substantial gainful activity
limit.

> The claimant's trial work period argument does not
> have merit.  The claimant is not entitled to a second
> trial work period.  The regulations clearly limit the
> number of trial work periods to which an individual is
> entitled.  Specifically, an individual may have only
> one trial work period during a period of entitlement
> to cash benefits (§ 404.1592(c)).
>
> The individual is generally entitled to a trial work
> period if the individual was entitled to disability
> insurance benefits (404.1592(d)(1).  This is echoed in
> POMS 13010.60.  A trial work period is available only
> once during a period of Title II disability.  However,
> should the individual be found disabled again either
> through a new application or d1rough an expedited
> reinstatement, then the individual would qualify for a
> new trial work period.

Admin. Rec. at 14.


    To be sure, the ALJ's conclusion is a correct statement of
the governing law: beneficiaries of disability payments are only
entitled to a single Trial Work Period during a specific period
of benefits entitlement.  20 C.F.R. § 404.1592(c).  What the ALJ
did not address, however, is whether Corbett's <u>belief</u> that she
was allowed or authorized to use a second Trial Work Period was

reasonable, given the complexity of the applicable rules and
regulations, the 24-year gap in her work activity, her claimed
effort to confirm her eligibility for a second Trial Work
Period, and her ability to accurately parse the applicable
regulations and published agency guidelines.  Nor did the ALJ
make a finding as to whether a representative of the SSA told
Corbett that she <u>could</u> return to work under a new Trial Work
Period.  Such findings are a necessary predicate to determining
whether Corbett was "at fault" for the overpayment of benefits
based upon the "acceptance of a payment which [she] either <u>knew</u>
or <u>could have been expected to know</u> was <u>incorrect</u>."  20 C.F.R. §
404.507(c) ("Fault") (emphasis supplied).  <u>See generally</u> POMS,
<u>Fault Determinations for Commonly Occurring Overpayment</u>
<u>Situations</u>, GN 02250.021, § B(3), "Undocumented Allegations of
Reporting" ("Before making the fault determination, you must
consider the allegation [that the claimant made a report to the
SSA or sent it information].").

    If Corbett relied upon "erroneous information from an
official source with the Social Security Administration" about
the availability of a second Trial Work Period, she would be
entitled to a finding that she was "without fault" for the
overpayment of benefits.  <u>See</u> 20 C.F.R. § 404.510a.  <u>See also</u>
POMS, <u>Misinformation from an Official Source - Waiver</u>, GN

02250.061, § B(2) ("Find the individual not at fault in causing
the overpayment if you determine that an overpayment, which
resulted from the individual's action or lack thereof, was
caused by misinformation from an official source.  Approve the
waiver under the 'against equity or good conscience'
provision.").

Moreover, even if the ALJ were to conclude that substantial
evidence supports the government's contention that Corbett did
not receive such erroneous advice, a question still remains as
to whether Corbett's asserted belief that she was entitled to a
second Trial Work Period was reasonable or whether she "knew or
could have been expected to know" that belief was incorrect and,
therefore, that her retention of disability benefits beginning
in April of 2019 was improper.  See 20 C.F.R. § 404.507
("Fault").  See also POMS, Fault Determinations for Commonly
Occurring Overpayment Situations, GN 02250.021, § B(4),
"Misunderstanding Our Policies on Entitlement or Eligibility"
("We may find an individual not at fault for an overpayment if
they misunderstood our policies on Title II entitlement or if
they misunderstood information given to them.").

Finally, the court notes that the extended period of time
that passed between Corbett's first Trial Work Period and her

second effort to re-enter the workforce - roughly 24 years - is
a relevant factor in determining whether she reasonably could
have believed that she could return to work in December of 2018
under the terms of another Trial Work Period and, ultimately,
whether she was "at fault" for the claimed overpayments.  See
generally Id. at § B(2) (noting that the amount of time that has
passed since the claimant's last experience with a particular
SSA rule or regulation is relevant "because the individual might
not remember" the proper application of that rule).

## Conclusion

The law, regulations, and POMS provisions governing Trial
Work Periods, Extended Periods of Eligibility, reinstatement of
benefits, the various limits imposed on earned income, and the
circumstances under which a beneficiary is entitled to a second
Trial Work Period are complex, if not convoluted.  Corbett does
not appear to have been legally trained, nor was she represented
by counsel during the period of time at issue.  She plausibly
and supportably alleges that she mistakenly, but reasonably and
in good faith, believed that she was allowed a new Trial Work
Period when, after her benefits were terminated for roughly 19
months in the early 1990's but then reinstated for more than 24
years, she attempted to re-enter the workforce in December of
2018 - after all, the Trial Work Period exists for the very

23

purpose of encouraging such return-to-work efforts by
beneficiaries of disability benefits.  Moreover, Corbett claims
to have contacted the SSA to confirm that belief and says she
was told that she could use a second Trial Work Period to again
test her ability to return to work.

The ALJ's written decision does not resolve critical issues
related to Corbett's "reasonable belief" claim.  Additionally,
as noted above, the conclusion that Corbett was "at fault" for
the claimed benefit overpayments because "she knew or should
have known that her return to work in 2019 could affect her
entitlement to disability benefits," Admin. Rec. at 15 (emphasis
supplied), does not align with the applicable standard for
determining when a claimant is or is not "at fault."  See 20
C.F.R. § 404.507(c) (a claimant shall be deemed "at fault" if he
accepts a payment "which he either knew or could have been
expected to know was incorrect.") (emphasis supplied).  Remand
is, therefore, necessary.

Finally, the court notes that even if the ALJ were to
determine on remand that Corbett's understanding of the
situation was reasonable and her return to work in December of
2018 is treated as if it were subject to the terms of a Trial
Work Period and ensuing Extended Period of Eligibility, it still

24

appears that during that "presumed" EPE Corbett may have earned
more than the SGA limit in several months, yet still received
disability benefit payments.  The court leaves it to the ALJ to
determine a proper resolution of that circumstances, should it
be determined that Corbett was "without fault" within the
meaning of the applicable regulations and otherwise entitled to
a waiver of repayment of at least some of the $52,000 sought by
the government.  See generally 42 U.S.C. § 404(b)(1).  See also
20 C.F.R. §§ 404.508 ("Defeat the Purpose of Title II") and
404.509 ("Against Equity and Good Conscience").

Alternatively, of course, the government and Corbett may be
able to reach a fair and just settlement of the present dispute
that resolves the government's claims to all parties'
satisfaction.

For the foregoing reasons, claimant's Motion for an Order
Reversing the Decision of the Commissioner (**document no. 7**) is
granted to the extent she seeks a remand for further
proceedings.  The Commissioner's Motion for an Order Affirming
the Decision of the Commissioner (**document no. 8**) is denied.

Pursuant to sentence four of 42 U.S.C. § 405(g), the
decision of the ALJ dated September 18, 2024 is vacated and this

25

matter is hereby remanded for further proceedings consistent with this order.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

       **SO ORDERED.**

                               _____

                               Steven J. McAuliffe
                               United States District Judge

January 23, 2026

cc:  Counsel of Record